**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| LONESTAR GEOPHYSICAL | ) | |
| SURVEYS, L.L.C., an Oklahoma | ) | |
| limited liability company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-12-0761-F |
| | ) | |
| TAQA NORTH LTD, an Alberta, | ) | |
| Canada corporation, and | ) | |
| TAQA NORTH USA, INC., a | ) | |
| Colorado corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

The issue before the court is personal jurisdiction. Defendant TAQA North Ltd. is an Alberta, Canada corporation. Defendant TAQA North USA, Inc. is a Colorado corporation. Each defendant moves separately for dismissal under Rule 12(b)(2), Fed. R. Civ. P., TAQA North Ltd. at doc. no. 19 and TAQA North USA, Inc. at doc. no. 7. TAQA North Ltd. also moves for dismissal under Rule 12(b)(4) arguing that process, and service of process, are deficient. The motions have been fully briefed through the supplemental sur-reply stage and evidence has been submitted with the parties' papers.

### I. <u>Background</u>

This removed action is brought by an Oklahoma limited liability company, Lonestar Geophysical Surveys, LLC (Lonestar), against TAQA North Ltd. and TAQA North USA, Inc., neither of which, as explained in more detail later, does business in Oklahoma.

Lonestar seeks damages for non-payment for services allegedly provided by Lonestar to Terra-Sine Resources Ltd. (Terra-Sine) pursuant to an agreement referred to in this order as the Terra-Sine-Lonestar agreement. Per the allegations, Terra-Sine is located in Calgary, Alberta, Canada. Doc. no. 1-2, ¶ 7. Terra-Sine is not a party to this action.

Pursuant to the Terra-Sine-Lonestar agreement, Lonestar was retained by Terra-Sine to acquire seismic data relating to a project in Montana called the Salt Lake 2010 3D project (the Montana project). The seismic data collected by Lonestar was for the benefit of TAQA entities. However, no TAQA entity was a party to the Terra-Sine-Lonestar agreement. The petition alleges that the Terra-Sine-Lonestar agreement was negotiated on behalf of the TAQA defendants, by the TAQA defendants and their agent Terra-Sine. Doc. no. 1-2, ¶ 7. Lonestar alleges that its invoices sent pursuant to the Terra-Sine-Lonestar agreement remain unpaid in the amount of $1,126,895.86. Doc. no. 1-2, ¶ 8.

Lonestar alleges three types of claims against TAQA North Ltd. and TAQA North USA, Inc.: 1) breach of the Terra-Sine-Lonestar agreement -- collection on an open account; 2) breach of the covenant of good faith and fair dealing which Lonestar alleges exists between it and the TAQA defendants; and 3) unjust enrichment, based on allegations that the TAQA defendants have used the seismic data generated by Lonestar but have not paid the invoices sent by Lonestar to both Terra-Sine and TAQA North Ltd. Doc. no. 1-2, ¶¶ 20-30.

## II. Rule 12(b)(2) Standards

The framework for determining issues of personal jurisdiction is set out in Marcus Food Company v. DiPanfilo, 671 F.3d 1159 (10th Cir. 2011).

> Where a federal lawsuit is based on diversity of citizenship, the court's jurisdiction over a nonresident defendant is determined by the law

of the forum state. Fed.R.Civ.P. 4(e). The party seeking to establish personal jurisdiction over a foreign litigant must make two showings: *first*, that the exercise of jurisdiction is sanctioned by the state's long-arm statute; and *second*, that it comports with the due process requirements of the Fourteenth Amendment. Emp'rs Mut. Cas. Co., 618 F.3d at 1159.

Marcus Foods, 671 F.3d at 1166, emphasis added.

As to the first issue, the Oklahoma long-arm statute allows jurisdiction to the full extent permitted by federal due process principles. *See*, 12 O.S. 2011 § 2004.F.; Gilbert v. Security Finance Corp. of Oklahoma, Inc., 152 P.3d 165, 173 (Okla. 2006) (Oklahoma's long arm statute extends jurisdiction of the Oklahoma courts to the outer limits permitted by the Oklahoma Constitution and by the Due Process Clause of the Fourteenth Amendment to the United States Constitution). Therefore, state and federal issues collapse into one issue and the court moves on to the federal due process analysis.

The federal due process inquiry is also a two-step analysis. Marcus Foods describes the first step as follows.

First, [defendant] must have "minimum contacts" with the forum state, demonstrating that he "purposefully availed" himself of the protections or benefits of the state's laws and "should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *see also* Emp'rs Mut. Cas. Co., 618 F.3d at 1159–60 (reiterating the Burger King standard). Although agreements alone are likely to be insufficient to establish minimum contacts, " 'parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities.' " TH Agric. & Nutrition, LLC v. Ace Eur. Grp. Ltd., 488 F.3d 1282, 1287–88 (10th Cir.2007) (quoting Burger King, 471 U.S. at 473, 478, 105 S.Ct. 2174). The court must examine the parties' "prior negotiations and contemplated future consequences, along with the terms

of the contract and the parties' actual course of dealing." *Id.* at 1288 (internal quotation marks omitted).

<u>Marcus Foods</u> at 1166-67.

As explained in <u>Omi Holdings, Inc. v. Royal Insurance Co. of Canada</u>, 149 F.3d 1086, 1090-91 (10th Cir. 1998), the minimum contacts standard may be met in two ways.

> First, a court may, consistent with due process, assert *specific jurisdiction* over a nonresident defendant "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." <u>Burger King</u>, 471 U.S. at 472, 105 S.Ct. 2174 (internal quotations omitted). Where a court's exercise of jurisdiction does not directly arise from a defendant's forum-related activities, the court may nonetheless maintain *general personal jurisdiction* over the defendant based on the defendant's general business contacts with the forum state. <u>Helicopteros Nacionales de Colombia v. Hall</u>, 466 U.S. 408, 415, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). However, "[b]ecause general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts.' " <u>Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 567 (2d Cir.1996) (quoting <u>Helicopteros</u>, 466 U.S. at 416, 104 S.Ct. 1868.).

*Id.*, emphasis added. (Further standards for determining general or specific personal jurisdiction are stated later in this order.)

If minimum contacts are shown, then the court moves on to the second step of the due process analysis.

> If [defendant] is found to have the requisite minimum contacts with [the relevant state], then we proceed to the second step in the due process analysis: ensuring that the exercise of jurisdiction over him "does not offend 'traditional notions of fair play and substantial justice.'" *See* <u>World–Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 292,

100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). [Defendant] bears the burden at this stage to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *See* <u>Dudnikov v. Chalk & Vermilion Fine Arts, Inc.,</u> 514 F.3d 1063, 1080 (10th Cir.2008). We consider the following five factors... in deciding whether the exercise of jurisdiction would be fair:

> (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states or foreign nations in furthering fundamental social policies.

*Id*. (brackets omitted); *see also* <u>OMI Holdings, Inc.,</u> 149 F.3d at 1095 (applying these factors in a case involving a Canadian corporation). "[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction." <u>TH Agric. & Nutrition, LLC</u>, 488 F.3d at 1292 (internal quotation marks and brackets omitted).

<u>Marcus Food</u> at 1167.

To recap, to show personal jurisdiction over either defendant, first, minimum contacts must be shown by either general or specific jurisdiction; second, jurisdiction must not offend traditional notions of fair play and substantial justice as determined under a five-factor test.

The applicable evidentiary burdens at these two steps are as follows.

> When a district court rules on a Fed.R.Civ.P. 12(b)(2) motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in this case, the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion. <u>Kuenzle v. HTM Sport-Und Freizeitgerate AG</u>, 102 F.3d 453, 456 (10th Cir.1996). The plaintiff may make this prima facie showing by demonstrating, via

affidavit or other written materials, facts that if true would support jurisdiction over the defendant. In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating "that the presence of some other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at 477, 105 S.Ct. 2174; *see also* Rambo, 839 F.2d at 1419 n. 6.

Omi Holdings, 149 F.3d at 1091.

No evidentiary hearing is necessary here. The court accepts as true all allegations in the petition which are not contradicted by the defendants' evidence, and the court resolves any factual disputes in plaintiff's favor. Melea, Ltd. v. Jawer SA, 511 F.3d 1060, 1065 (10th Cir. 2007). The court does not take as true, however, allegations or evidentiary statements which are merely conclusory. *See,* IMARK Marketing Services, LLC v. Geoplast, S.p.A., 753 F.Supp.2d 141, 147-48 (D.D.C. 2010) (plaintiff cannot rest on bare allegations or conclusory statements and must allege specific facts connecting each defendant with the forum; court may receive and weigh affidavits and any other relevant matter to assist it in determining jurisdictional facts; but any factual discrepancies with regard to the existence of personal jurisdiction must be resolved in favor of the plaintiff). For example, bald statements that Terra-Sine was or was not the agent of the TAQA defendants are given little to no weight depending on the circumstances.

As no evidentiary hearing is conducted, plaintiff is only required to make a *prima facie* showing of minimum contacts to support personal jurisdiction. *Id*. If plaintiff makes such a showing, then to avoid personal jurisdiction at the second step of the due process analysis, a defendant must demonstrate, in a compelling manner, that jurisdiction is unreasonable under the five-factor analysis.

III.  Record Evidence.

This order summarizes pertinent record evidence, grouping it into four categories.  Whether or not listed here, the entire record has been considered.

*(1).  General Business Presence of the Defendants*

*In Oklahoma*

*(a).  TAQA North Ltd.*

The evidence shows that defendant TAQA North Ltd. is incorporated under the laws of the Province of Alberta, Canada; that its head office is located in Calgary, Alberta; that it is not registered or authorized to do business in Oklahoma; and that it conducts no business there.  Doc. no. 19, ¶13.  The evidence shows that none of TAQA North Ltd.'s employees with knowledge about Lonestar's work or the Montana project are located in Oklahoma, and that none of the documentation which this defendant contends is relevant to the Montana project is located in Oklahoma.  Doc. no. 19, ¶ 14.  TAQA North Ltd. had no communications with Lonestar, in Oklahoma,[1] in connection with the Montana project, this action, or Lonestar's role with respect to Terra-Sine.  Doc. no. 19, ¶ 17.

The evidence shows that TAQA North Ltd. is the managing partner of TAQA North -- an Alberta, Canada, general partnership which is not named as a defendant in this action but which is a party to the Master Seismic Data Acquisition Agreement (the MSDAA, which is the agreement between TAQA entities and Terra-Sine regarding the Montana project).  *See*, doc. no. 19, ¶ 1 (stating that TAQA-Canada, the label used for TAQA North Ltd. in doc. no. 19,  is the managing partner of TAQA North, and that TAQA-Canada entered into the MSDAA as managing partner of

---

[1]TAQA North Ltd. received, outside of Oklahoma, certain invoices from Lonestar which the evidence shows TAQA North Ltd. did not request or pay.  The invoices were very similar to invoices also sent by Lonestar to Terra-Sine.  See doc. nos. 7-1, ¶¶ 20-22 and 19-1, ¶¶20-22.

TAQA North; *see also*, MSDAA at doc. no. 7-2, introductory paragraph and signatures). TAQA North may from time to time retain vendors, send revenue to working interest or royalty owners, or contract with entities that may have mailing addresses in Oklahoma or are affiliated with Oklahoma entities. Doc. no. 19, ¶ 15. Such relationships with any person in Oklahoma do not pertain to land or mineral interests in Oklahoma. Doc. no. 19, ¶ 15.

The evidence shows that TAQA North Ltd. has no significant business presence in Oklahoma and does not conduct any business within the State of Oklahoma. Doc. no. 19, ¶ 15. TAQA North Ltd. does not hold itself out as conducting business within Oklahoma; does not advertise or list any services within the state; does not have any offices, employees or agents within the state; and does not send agents into the state or own any accounts with any Oklahoma-based banks or financial institutions. Doc. no. 19, ¶ 16.

### (b). TAQA North USA, Inc.

The evidence shows that the other defendant, TAQA North USA, Inc., is affiliated with TAQA North Ltd.[2]

The evidence shows that defendant TAQA North USA, Inc., is primarily an oil and gas company, doc. no. 7 ¶ 15; that it is incorporated in Colorado with its head office in Colorado, doc. no. 7, ¶ 13; that it is registered to do business in Montana, North Dakota and Wyoming; and that it is not registered to do business in Oklahoma. Doc. no. 7, ¶ 13. None of TAQA North USA, Inc.'s employees with knowledge about Lonestar's work or the Montana project are located in Oklahoma. Doc. no. 7, ¶ 14.

---

[2]There is no dispute these are affiliated entities, which is how they are described in defendants' briefing. Doc. no. 7, p. 5. (When this order cites page numbers, it uses the court's page numbers found at the top of each page.) Plaintiff states that TAQA North USA, Inc. is a wholly-owned subsidiary of TAQA North Ltd. Doc. no. 21-2, ¶ 9.

None of the documentation which this defendant contends is relevant to the Montana project is located in Oklahoma. Doc. no. 7, ¶ 14. TAQA North USA, Inc. did not have any communications with the plaintiff, in Oklahoma, in connection with the Montana project, or in connection with plaintiff's role with Terra-Sine. Doc. no. 7, ¶17.

The evidence shows that TAQA North USA, Inc. does not hold itself out as conducting business within Oklahoma; does not advertise or list its services within Oklahoma; has no offices, employees or agents within Oklahoma; sends no agents into the state; and owns and holds no accounts with banks or financial institutions within Oklahoma. Doc. no. 7, ¶ 16.

The evidence shows that defendant TAQA North USA, Inc. occasionally retains vendors from across the country and that some of these vendors' mailing addresses are shown to be in Oklahoma. Doc. no. 7, ¶ 15. Lonestar is not such a vendor, however. TAQA North USA, Inc. also sends revenue or miscellaneous payments to a number of lessors, revenue interest owners and working interest owners whose mailing addresses are shown to be in Oklahoma. Doc. no. 7, ¶ 15. Such payments stem from production revenue resulting from TAQA North USA, Inc.'s oil and gas operations, which, in the United States, are conducted in Montana, North Dakota and Wyoming, and not in Oklahoma. Doc. no. 7, ¶ 15.

(2). <i>Provisions in the MSDAA</i>

Next the court reviews provisions in the Master Seismic Data Acquisition Agreement (the MSDAA), the agreement between TAQA entities and Terra-Sine regarding the Montana project. The agreement is material not only because it reflects upon the degree, if any, to which the TAQA defendants directed their activities at residents of the forum state, but also because the parties rely on this agreement to show agency, or the lack of it, between TAQA entities and Terra-Sine. For example,

Lonestar cites provisions in the MSDAA regarding certain types of authority or control by TAQA entities over Terra-Sine. By attempting to show that Terra-Sine was the agent of TAQA entities when Terra-Sine subcontracted with Lonestar, an Oklahoma entity, plaintiff seeks to show that the TAQA defendants subjected themselves to the jurisdiction of Oklahoma courts via the actions of Terra-Sine. Defendants also rely on the MSDAA. For example, defendants cite provisions in the MSDAA which state that no agency existed between TAQA entities and Terra-Sine. Defendants also rely on Terra-Sine's duties as stated in the MSDAA to show that TAQA entities did not exercise significant control over Terra-Sine, which they argue negates an agency relationship.

There is no dispute regarding the text of the MSDAA.

Per the MSDAA, doc. no. 7-2, p.2 (introductory paragraph), the MSDAA is among the following parties:

– Terra-Sine Resources Ltd., which is referred to as "Contractor" in the MSDAA;

– TAQA North, the Alberta, Canada general partnership which is not a party to this action; and

– TAQA North's managing partner, TAQA North Ltd., one of the two defendants in this action.[3]

As stated in the MSDAA, a fundamental objective of the MSDAA was for Terra-Sine to provide services and obtain seismic data for TAQA North Ltd. and TAQA North. Doc. no. 7-2, ¶ 3.1; doc. no. 7-1, ¶ 12; doc. no. 19-1, ¶ 12. The MSDAA provides that TAQA, *i.e.* TAQA North Ltd. (as used in the MSDAA,

---

[3]The other defendant in this action, TAQA North USA, Inc., is not a named party to the MSDAA but plaintiff argues the MSDAA binds all members of the "TAQA Group," a defined term of the MSDAA, an issue the court need not resolve.

"TAQA" refers to TAQA North Ltd.)[4] is exploring for oil and gas in certain areas, and that a critical objective of the services provided by Terra-Sine was to obtain seismic data, including a 3D seismic survey; all of which data are owned by TAQA and held in trust for TAQA by Contractor [Terra-Sine].  Doc. no. 7-2, initial recitals at ¶¶ A and B.

The MSDAA provides that "Contractor [Terra-Sine] shall submit all matters requiring TAQA's approval with adequate timeliness so that TAQA has reasonable time to review all such submissions and accompanying support and/or justification." ¶ 2.3.  The MSDAA states that "Contractor is expert in the type of Services to be provided pursuant to this Agreement and Contractor Personnel are specialists who have the most recent and proven technical knowledge applicable to the Services...." ¶ 3.4.  The MSDAA states, "Contractor shall communicate with the TAQA Representative to ensure that the Services are performed and the Data is obtained and secured to the satisfaction of TAQA in a safe and timely manner."  ¶3.5.  The MSDAA provides that Contractor shall prepare reports of progress as TAQA may request from time to time.  ¶ 3.7.

The MSDAA provides that "TAQA Representative shall communicate to Contractor applicable information, instructions and decisions of TAQA."  ¶ 5.1.  The MSDAA authorized TAQA, with three days notice to Contractor, to inspect any part of the services, the data, or any contractor equipment, wherever such services are being performed or any data, materials or equipment are being used or stored.  ¶ 7.1.  The MSDAA specifies that all data shall be TAQA's sole and exclusive property, shall be held in trust for TAQA, and shall be furnished to TAQA at TAQA's request

---

[4]*See*, doc. no. 7-2, Ex. E, definition of "TAQA," p. 25.

no later than completion of the services or as otherwise directed by TAQA in writing. ¶ 8.1.

The MSDAA provides: that Terra-Sine was required to invoice TAQA for services rendered by Terra-Sine during the preceding month, ¶ 12.1; that when invoices included defined pass through costs or reimbursable costs, documentation to support such charges was required to be submitted to TAQA, ¶ 12.2; that properly invoiced amounts were due and payable by TAQA to Terra-Sine, unless disputed, ¶12.3 - ¶ 12.4; that, as pass through costs, TAQA would reimburse Terra-Sine its costs incurred plus a 3% mark-up, "for properly incurred direct costs for services provided under subcontracts related to the provisions of Services entered into by Contractor directly (and not on an agency basis for TAQA), excluding subcontracts with any of Contractor's affiliates and such other costs as may be agreed to in writing...." MSDAA, Ex. B, Pass Through Costs, parenthetical in original.

The MSDAA listed a variety of excluded costs which did not qualify as pass through or reimbursable costs. To name a few, these included: costs for meals, housing and automobile expenses for Contractor's employees; costs of any subcontractors not approved by TAQA; deductibles payable per Contractor's insurance; and penalties payable by Contractor due to performance of the work contrary to any laws. Doc. no. 7-2, Ex. B, Excluded Costs.

The MSDAA further provided: that Terra-Sine was paid on a contract basis at various "milestones," *see* ¶ 11.1 (estimated total cost of services $2,900,000, and Ex. B, Total Compensation); that Terra-Sine would provide its own equipment and resources, ¶6.1.2; that Terra-Sine would provide its own insurance subject to certain minimum requirements, with TAQA named as an additional insured, ¶ 17.1 and Ex. A, Insurance; and that no expenses of Terra-Sine would be paid by TAQA unless they were reimbursable by TAQA per the terms of the agreement, ¶ 11.4 and Ex. B. The

MSDAA provided that Terra-Sine shall not assign the agreement in whole or in part or subcontract any part of the services without TAQA's prior written approval.  ¶ 24.3.

The MSDAA specified that Kelly Hrabi was the designated TAQA representative on the Montana project.  Doc. no. 7-2, Ex. A, ¶ 5.1.

The MSDAA also provided that TAQA had rights to terminate the MSDAA. Doc. no. 7-2, ¶ 22.0. - ¶ 22.7.

According to the section of the MSDAA entitled "Status of TAQA and Contractor," "Contractor [Terra-Sine] shall act as an independent contractor and not as an agent of TAQA in the performance of the Agreement and nothing contained [in the MSDAA] or contained in any agreement between Contractor and any other contractor or subcontractor at any tier shall create any such relationship [agency] with TAQA."  Doc. no. 7-2, ¶ 23.1.[5]  The MSDAA further provided that "under no circumstances shall the employees, or any of them, of Contractor or any Subcontractor be deemed to be employees of TAQA."  ¶ 23.1.

Exhibit C to the MSDAA is entitled "Scope of Work."  The section of Exhibit C that pertains to "Parameter testing and review" provides that "[f]rom time to time as required by TAQA[,] Contractor will review and recommend, if needed, any changes to the Project parameters as required."  Doc. no. 7-2, p. 19.  The section of Exhibit C that pertains to "Project Management," doc. no. 7-2, p. 19, provides that "TAQA is to approve all Subcontractors and that the Contractor is to manage all such Subcontractors such that they perform all applicable requirements of this agreement." Exhibit C then states that "Contractor is ultimately responsible for the performance of Subcontractors.  Since this is a full service arrangement the Contractor is

_____

[5]Where conclusory characterizations would favor the defendants, the court gives them no weight.

responsible to manage the work it does including the use and provision of all subcontracted services." Doc. no. 7-2, p. 19.

Exhibit C also provides that subject to obtaining TAQA's prior consent, "Contractor will, at its cost, select and recruit applicable Subcontractors to assist Contractor to perform the Services." Doc. no. 7-2, p. 19. It then states, "Tasks involved therewith will include, as applicable, ... request for acquisition bids from competent Subcontractors; the normalization of any proposals or bids received from Subcontractors (Cost Estimates); a review with TAQA of Subcontractors and their proposals; and the awarding of applicable subcontract agreement by Contractor after obtaining TAQA's approval thereof." Doc. no. 7-2, p. 19.

Exhibit C provides that "Contractor remains responsible for the performance of subcontractors, including compliance by the subcontractor and all Contractor Personnel with all provisions of this Agreement, regardless of any consent provided by TAQA." Doc. no. 7-2, p. 19.

Exhibit C states, "The Contractor shall develop, prepare and provide TAQA and any approved seismic subcontractor with a field package in accordance with the requirements of this Exhibit C or, as applicable, in a Supplemental Agreement." Doc. no. 7-2, p. 19. Exhibit C includes numerous other duties of the contractor including: tracking of health and safety issues; environmental monitoring; field supervision; third party invoice verification; detailed cost tracking; conducting searches and reporting search results to TAQA; obtaining or conducting all third party approvals, notifications, consultations or consents required to provide the services and obtain the data for TAQA; obtaining and maintaining governmental authorizations; and obtaining all right of entry permits from the owners of the surface; etc. Doc. no. 7-2, pp. 19 - 20.

The section of Exhibit C that pertains to "Reporting," doc. no. 7-2, p. 20, provides that TAQA is to specify the type and period of reporting by the contractor, and states that "[t]he reporting is important to both let TAQA monitor performance of the Services but also to address any need for changes to the parameters of those Services."

### (3). *The Terra-Sine-Lonestar Agreement*

The court next reviews evidence pertaining to the Terra-Sine-Lonestar agreement, the agreement out of which plaintiff's claims directly arise.

The evidence shows that Terra-Sine accepted plaintiff Lonestar's bid to provide services on the Montana project. The bid letter was sent from Lonestar's Oklahoma office to Terra-Sine at Terra-Sine's address in Calgary, Alberta, Canada where the bid was accepted and executed by Terra-Sine. Doc. no. 7-6, affidavit of William Goodwin at ¶¶ 7-8 and 7-6, Ex. A. A supplement was also executed on behalf of Terra-Sine. Doc. no. 7-6, Goodwin aff. at ¶ 9, and 7-6, Ex. B. Together, these documents comprise the Terra-Sine-Lonestar agreement.

The evidence shows that neither of the TAQA entities named as a defendant in this action is a named party to the Terra-Sine-Lonestar agreement. Doc. no. 7-6, Goodwin aff. at ¶ 10.

The evidence shows that TAQA North Ltd. received certain invoices from Lonestar totaling $1,126,895.86; that TAQA North Ltd. did not request the invoices from Lonestar; and that the invoices from Lonestar were very similar to invoices which Lonestar had addressed to Terra-Sine. Doc. no. 7-1, affidavit of Michael Chase at ¶¶20-21, and exhibits B and C to Chase affidavit (invoices sent by Lonestar to TAQA North Ltd and invoices sent to Terra-Sine). The evidence shows that the invoices were disputed by Terra-Sine and that Terra-Sine, by letter from Mr. Goodwin, recommended to TAQA that the invoices be rejected as Terra-Sine was

attempting to resolve the issue by payment to Lonestar in return for a mutual release agreement. Doc. no. 7-1, Chase affidavit at ¶22.

*(4).* *Individuals' Statements and Conduct*

Lastly, the court reviews evidence regarding statements and conduct by various individuals. This evidence is material not only for its general relevance to the personal jurisdiction issue, but also because plaintiff relies on various statements and conduct by the parties' representatives on site in Montana, to show that Terra-Sine was the agent of the TAQA defendants. Again, plaintiff's version of events, and plaintiff's version of any disputed facts, is credited as true, although merely conclusory labels or statements are given little to no weight depending on the circumstances.

Lonestar relies on the following evidence provided by the affidavit of Blair Chambers, the Vice-President of U.S. Operations and President of Canadian Operations for Lonestar Geophysical Surveys, and a resident of Abbotsford, British Columbia, Canada. Doc. no. 21-1, ¶ 1.

Mr. Chambers testified that the use of front men or agents by oil and gas companies in Canada is very common and used to maintain anonymity from competitors and to shield them from liability for violation of governmental safety standards. Doc. no. 21-1, ¶ 3. He testified that it was known that the program in Montana was for TAQA, and that Mr. Goodwin of Terra-Sine was doing TAQA's front end work. Doc. no. 21-1, ¶ 7. Mr. Chambers was told that TAQA was a good client and, typically, that if there were extra charges at the end of the program TAQA had been known to step up and pay for some extra charges. Doc. no. 21-1, ¶ 7.

Mr. Chambers testified that the company representative for TAQA North Ltd., Kelly Hrabi, spent two weeks on the Montana seismic shoot "advising Goodwin

[Terra-Sine] on the Montana seismic project." Doc. no. 21-1, ¶ 8. (No details of this advice follow in this particular paragraph of the affidavit.)

Mr. Chambers's affidavit goes on to state that when he met Mr. Hrabi, he asked Mr. Hrabi if he worked for Mr. Goodwin (of Terra-Sine) and that Mr. Hrabi said it was the other way around, that Goodwin worked for him, and that he was employed by TAQA and was there to represent TAQA during the project start-up. Doc. no. 21-1, ¶ 8. Mr. Chambers states that at some time during the Montana seismic project, "Goodwin admitted to me that he was the agent for TAQA." Doc. no. 21-1, ¶ 9. Mr. Chambers also testified that plaintiff Lonestar knew that TAQA was "the principal" before starting the Montana seismic project. Doc. no. 21-1, ¶10.

Mr. Chambers testified that on one occasion during the Montana shoot, he had dinner with Mr. Hrabi (TAQA) and Mr. Goodwin (Terra-Sine). Production reports were discussed during the dinner. Doc. no. 21-1, ¶ 11. Mr. Chambers (Lonestar) said that reports would be submitted by 10:00 a.m. daily. Doc. no. 21-1, ¶ 11. Mr. Hrabi (TAQA) then told Mr. Chambers (Lonestar) that TAQA required daily production reports by 8:00 a.m., and Mr. Goodwin (Terra-Sine) repeated what Mr. Hrabi had stated. Doc. no. 21-1, ¶ 11. Safety statistics were also discussed at the dinner. Mr. Hrabi (TAQA) told Mr. Chambers (Lonestar) that TAQA required accident reports or serious near miss reports immediately, and that Mr. Chambers (Lonestar) could send them directly to Mr. Hrabi (TAQA) if required. Doc. no. 21-1, ¶ 11.

Also at the dinner, Mr. Hrabi (TAQA) told Mr. Chambers (Lonestar) that he was very happy to have an additional seismic contractor in the business to choose from, and that he hoped Lonestar would succeed with the Montana seismic project. Doc. no. 21-1, ¶ 11. Mr. Chambers (Lonestar) discussed potentially problematic areas of the project, primarily how additional snow removal would hurt "our bottom line,"

and Mr. Hrabi (TAQA) agreed to consider paying any additional billing that Mr. Chambers (Lonestar) submitted.  Doc. no. 21-1, ¶ 11.[6]

Plaintiff also relies on an affidavit from Heath Harris, the sole member and manager of Lonestar Geophysical Surveys, LLC.  Doc. no. 21-2, ¶ 1.  Mr. Harris (Lonestar) states that it is the "custom and practice of oil companies in Canada to use agents to secure such things as seismic drilling contracts" and that "[e]ven though they are sometimes referred to as independent contractors or front men, these agents work on behalf of their client."  Doc. no. 21-2, ¶ 3.

Mr. Harris (Lonestar) also testified that Mr. Goodwin (Terra-Sine) told him (Lonestar) that Mr. Goodwin (Terra-Sine) would have to get approval from his client for any cost overruns.  Doc. no. 21-2, ¶ 4.  Mr. Harris (Lonestar) also testified that TAQA has been using the seismic information which Lonestar shot on the Montana project.  Doc. no. 21-1, ¶8.

Although the MSDAA provided that TAQA was to approve the selection of subcontractors by Terra-Sine, the supplemental affidavit of William Goodwin, president of Terra-Sine, states that Terra-Sine did not request or receive approval from TAQA in order to subcontract with Lonestar regarding the Salt Lake 3D project (the Montana project).  Doc. no. 26-1, ¶ 5.  Mr. Goodwin (Terra-Sine) testified in his supplemental affidavit (and there is no evidence to refute these specific contentions) that the field crew supervisor on the project for Terra-Sine was Wayne Starchuck, and that Mr. Starchuck received directions only from Mr. Goodwin of Terra-Sine and not from any TAQA entity.  Doc. no. 26-1, ¶4.

---

[6]This last fact, like some of plaintiff's other facts, is disputed by defendants, doc. no. 26-1, ¶ 7, but the court takes it as established.

## IV.  General Personal Jurisdiction

A court may maintain general personal jurisdiction based on a defendant's general business contacts with the forum state; however, as general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts.  Omi Holdings, 149 F.3d 1086, 1091.

Defendants argue that the court has no general personal jurisdiction over either of them.  They have submitted evidence which shows that neither defendant has any business presence within the State of Oklahoma, and that neither defendant conducts or solicits any business within this state.

In response, plaintiff's briefs recite standards which apply to determinations of general personal jurisdiction.  Plaintiff, however, presents no analysis to explain how, on this evidentiary record, general personal jurisdiction is shown with respect to either defendant.

The extremely limited types of contact which defendants concede TAQA entities have with Oklahoma, such as payments sent to vendors or to royalty owners, do not establish continuous and systematic general business contacts with Oklahoma. Plaintiff has not made, or even seriously attempted, a *prima facie* showing of general personal jurisdiction over either defendant.  The court finds and concludes that general personal jurisdiction has not been established.

## V.  Specific Personal Jurisdiction

Specific personal jurisdiction applies if a defendant has purposefully directed its activities at residents of the forum, and if the litigation results from alleged injuries that arise out of or relate to those activities.  Omni Holdings, 149 F.3d at 1090-91. (This order refers to the first of these two inquiries as the purposeful availment requirement.  It refers to the second inquiry as the nexus requirement.)  Lonestar

contends specific personal jurisdiction exists because the TAQA defendants subjected themselves to suit in Oklahoma when Terra-Sine, their alleged agent, entered into an agreement with an Oklahoma entity, Lonestar, to provide seismic services in Montana.

An agency relationship may establish personal jurisdiction over the principal based on the acts of the agent. Trujillo v. Williams, 465 F.3d 1210, 1222, n. 13 (10th Cir. 2006) and cases cited there. *And see*, Romak USA, Inc. v. Rich, 384 F.3d 979, 985 (8th Cir. 2004) (party who relies on the authority of an agent to establish personal jurisdiction over the principal has the burden of proof regarding both the fact of the agency relationship and the scope of the agent's authority). A preliminary question, however, is which state's or province's law determines whether Terra-Sine was the agent of either TAQA defendant.

As Oklahoma is the forum state in this diversity action, the court applies Oklahoma choice of law principles. Moore v. Subaru of America, 891 F.2d 1445, 1448 (10th Cir. 1989). Doing so, the court concludes that the law which applies to the determination of whether Terra-Sine was the agent of the TAQA defendants, is the law of a jurisdiction other than Oklahoma.[7] As for whether Montana law or the law

---

[7]It is not clear whether Oklahoma would apply the Restatement (Second) of Conflicts of Law, § 291, "Relationship of principal and agent," to this issue. If Oklahoma were to apply § 291, that section references contract choice of law rules, explaining that agency usually results from a contract between the parties. Comment *b*. Here, the MSDAA provides that Alberta law governs the MSDAA. Doc. no. 7-2, ¶ 30.1.

If Oklahoma would not apply § 291, Oklahoma choice of law rules regarding contracts provide that parties may establish the place according to which the construction of the contract shall be determined. Midland Savings & Loan Co. v. Henderson, 150 P. 868 (Okla. 1915), syllabus by the court; *and see*, Okla. A. G. Op. No. 01-17, 2001 WL 505604 at 2 (despite 15 O.S. § 162, parties to a contract may provide that the law of a state other than the place of performance will govern).

Contract choice of law rules may not be the end of the story, however, because plaintiff argues that not only the MSDAA, but also the parties' conduct and statements, show agency.

Fortunately, as explained in the text, it is not essential for the court to determine which state's or province's law applies. What the court can say (which will become important at the second step of the due process analysis) is that Oklahoma law does not govern. The MSDAA
(continued...)

of a Canadian province applies, the court need not make that determination for two reasons. One, the agency issue is trumped by the court's findings at the second step of the due process analysis as discussed in Part VI of this order. Two, as discussed immediately below, even giving plaintiff the benefit of the loosest possible definition of agency, the evidence does not make a *prima facie* showing of the type of relationship necessary to pass the minimum contacts test.

On defendants' side of the agency argument, the evidence shows that Terra-Sine did not use any of TAQA's equipment or employees to perform the work in question; that Terra-Sine secured its own equipment and resources; that Terra-Sine was obligated to pay its own defined expenses; that Terra-Sine secured its own insurance; that Terra-Sine handled all government permits and landowner permissions; and that Terra-Sine was paid on a milestone basis rather than on a time basis. Moreover, there is no evidence that TAQA played any significant part in critical matters such as the specific manner of securing the actual seismic data.

On plaintiff's side of the agency argument, the evidence shows that the MSDAA and the parties' conduct indicates there was some type of working relationship between TAQA and Terra-Sine on the Montana project. Certain provisions in the MSDAA, as well as the fact that TAQA had a representative on the project for two weeks who interacted with both Terra-Sine and Lonestar, indicate that TAQA exercised at least some control over the actions of Terra-Sine and arguably also over Lonestar.

---

[7](...continued)
provided that the law of Alberta governed their contract; the place of performance of the MSDAA, and of the Terra-Sine agreement, is Montana; and virtually all of the conduct relied on by plaintiff to show agency occurred in Montana. Under general choice of law principles recognized in Oklahoma, the court is comfortable concluding that Oklahoma courts would not apply Oklahoma law to the agency issue.

On this record, it is possible (although the court does not so hold because it has not determined which specific law applies) that some type of limited agency relationship existed. The court is not convinced, however, that any degree of control, or any agency labeled as such by a state court, no matter how limited, is necessarily enough to satisfy federal minimum contacts requirements. As discussed in Omi Holdings, before finding minimum contacts, a court must determine in plaintiff's favor both the "purposeful availment" issue and the "arising out of" issue. Omni Holdings, 149 F.3d at 1091-95.

Any control or agency which arguably has been shown by a TAQA entity in relation to Terra-Sine's agreement with Lonestar or the work which Lonestar did on the Montana project, is minimal when viewed in context.[8] For example, TAQA entities exerted control over the timing of reports. But there is no evidence that TAQA entities exerted control over broader operations and decisions such as the specific manner in which the seismic data was obtained, or the manner in which government compliance was ensured.

Even assuming for sake of argument that a limited agency relationship existed, plaintiff has not presented *prima facie* evidence that Terra-Sine was the agent of TAQA *to the extent required* to establish minimum contacts with Oklahoma. As plaintiff has not passed the "purposefully availed itself" inquiry, the court does not address the "arising out of" inquiry.

---

[8]*See*, General Cigar Holdings, Inc. v. Altadis, S.A., 205 F.Supp.2d 1335, 1344 (S.D. Fla. 2002) ("What is required for jurisdiction based on agency is not *some* control but *operational* control by the parent over the subsidiary"; court acknowledged a corporate relationship that approached agency, but found insufficient evidence to attribute control by one entity over the other entity's basic operations; plaintiff did not meet its burden to establish an agency to justify personal jurisdiction).

Plaintiff has not made a *prima facie* showing of minimum contacts by either defendant with the State of Oklahoma. Accordingly, at the first step of the due process analysis, the court finds and concludes that defendants are each entitled to dismissal for lack of personal jurisdiction.

VI. <u>Traditional Notions of</u>
<u>Fair Play and Substantial Justice</u>

The court recognizes that there is room for debate regarding the above holding, especially considering the lack of clarity regarding which jurisdiction's law applies to the determination of agency. Therefore, as an alternative basis for its ruling, the goes on to the second step of the due process analysis. This step requires the court to determine whether the exercise of jurisdiction is so unreasonable in the circumstances as to violate fair play and substantial justice. <u>Omi Holdings</u>, 149 F.3d at 1095. To answer this question, the court uses a five factor analysis. *Id*.

*(1) <u>Burden on defendant of litigating in the forum</u>*

This first consideration is not dispositive but it is of primary concern in determining the reasonableness of asserting personal jurisdiction over a defendant. *Id*. at 1096. This factor is of special significance because it prevents the filing of vexatious claims in a distant forum where the burden of appearing is onerous. *Id*. When the defendant is from another country, as is the case here, the concern is heightened. *Id*. However, in some cases the interests of the plaintiff and the forum in exercising jurisdiction may be so strong as to justify even serious burdens placed on the alien defendant. *Id*.

With regard to the burden on the TAQA defendants to defend in Oklahoma, their lack of a license to conduct business in Oklahoma, their lack of offices in Oklahoma, their lack of agents in Oklahoma, the fact that they did not contract with Lonestar, and the fact that litigation in Oklahoma would require defendants'

representatives to travel outside their home country, are considerations which weigh in their favor under this factor. *See*, *id*. (where defendants were Canadian corporations with no license to conduct business in Kansas, no offices in Kansas, employing no agents in Kansas, and insuring no Kansas residents, and where litigation would require travel outside their home country with Canadian law governing the dispute, this factor weighed strongly in defendants' favor).

The first factor, which is of primary concern, weighs heavily in favor of the defendants' position that it would be unreasonable to require them to litigate this action in Oklahoma.

### (2) *Forum state's interest in adjudicating the dispute*

A state has an important interest in providing a forum in which its residents can seek redress for injuries caused by out-of-state actors. *Id*. at 1096. Thus, Oklahoma has an important interest in resolving this dispute because Lonestar is an Oklahoma entity.

Although less compelling, a state may also have an interest in adjudicating a dispute between two non-residents where the defendant's conduct affects forum residents. *Id*. Here, other than Lonestar, defendants' conduct in this case does not affect forum residents, so this particular consideration is given little weight.

The forum state's interest is also implicated where resolution of the dispute requires a general application of the forum state's law. *Id*. In this action, various Oklahoma choice of law principles apply to plaintiff's different claims. These complex choice of law issues have not been briefed. Nevertheless, applying Oklahoma's general choice of law rules and principles to this record, the court can conclude that Oklahoma courts would apply the law of some jurisdiction other

than Oklahoma to each claim.[9]  All of which is a long way of saying that Oklahoma's interest in applying its own law is not an interest weighed under the second factor.

Other than the fact that plaintiff is an Oklahoma entity, Oklahoma has no special interest in resolving this dispute.  The court finds that the second factor weighs moderately in favor of the plaintiff.

### (3) *Plaintiff's interest in convenient and effective relief*

This factor may weigh heavily in favor of a plaintiff where a plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit.  Omi Holdings, 149 F.3d at 1097.  In this case, the  arguments do not show or suggest that Lonestar's chances of recovery are less in another jurisdiction due to that forum's laws.

Lonestar is located in Edmond, Oklahoma.  Therefore, Lonestar has an obvious convenience and cost interest in litigating in Oklahoma.   The evidence does not show or suggest, however, that the costs of litigating in another forum would be so overwhelming to Lonestar as to practically foreclose pursuit of the lawsuit.  Although Mr. Harris (Lonestar's sole member and manager) states that it would be a "horrible inconvenience on a small company to have to litigate this matter in Calgary," and that

---

[9]The Terra-Sine-Lonestar agreement which underlies the breach of contract claim, does not specify which law applies.  Under Oklahoma choice of law rules this claim is likely determined by the law of the place of performance, Montana.  *See*, 15 O.S. § 162.  Oklahoma choice of law rules would likely, but not certainly, determine that the breach of the implied duty of good faith claim is governed by Montana law.  *See*, Panama Processes, S.A. v. Cities Service Company, 796 P.2d 276, 289 (Okla. 1990) ("Because [plaintiff's] theory is based on breach of fiduciary obligations stemming from the letter agreement, we will apply the choice-of-law rules governing the contract.").  Under Oklahoma choice of law rules, the claim for unjust enrichment appears to be governed by Montana as the state of performance.  *See*, Harvell v. Goodyear Tire and Rubber Co., 164 F.3d 1028, 1036 (Okla. 2006) (law of each state where the services were rendered governs any claim for unjust enrichment).

the "cost of litigating there would be overwhelming to Lonestar," doc. no. 21-2, ¶ 6, he offers no particulars as to why this is the case. Lonestar is large enough to provide seismic services in Montana. The court also notes that Blair Chambers's title is Vice-President of U.S. Operations *and President of Canadian Operations for Lonestar.* Doc. no. 21-1, ¶ 1, emphasis added. Mr. Chambers resides in British Columbia, Canada. Doc. no. 21-1, ¶ 1.

Although Mr. Heath's affidavit refers to the inconvenience and costs of litigating this action in Calgary, he offers no opinion regarding any burden as a result of litigating this action in Montana, or possibly in Colorado where TAQA North USA, Inc. is incorporated and has its principal place of business. Doc. no. 1, ¶ 3. The court also notes the Securities and Exchange filings by Lonestar which defendants have submitted to shed light on the size of Lonestar relevant to its ability to litigate outside Oklahoma. Doc. no. 26-2.

The court finds that the third factor weighs slightly in favor of the plaintiff.

(4) *Interstate judicial systems' interest in obtaining*
*the most efficient resolution of controversies*

Key to this factor is the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs, and whether jurisdiction is necessary to prevent piecemeal litigation. Omi Holdings, 149 F.3d at 1097.

Although plaintiff submits an affidavit from Mr. Harris (Lonestar) which states that he is a primary witness, other potential witnesses identified so far (Mr. Goodman, Mr. Hrabi, Mr. Chambers, and Mr. Chase) live outside Oklahoma.[10] The Montana project is not located in Oklahoma. The bid letter which constitutes the Terra-Sine-

---

[10]The court has not located information regarding where Mr. Hrabi lives, but on this record it is a safe assumption that he does not reside in Oklahoma. If this is incorrect, it would not change any results.

Lonestar agreement was addressed to Terra-Sine in Calgary, where it was accepted and executed by Terra-Sine. TAQA North USA, Inc. is a Colorado corporation. TAQA North USA, Inc. states that its knowledgeable employees are located in Colorado and Canada. Both TAQA defendants contend that all relevant documents they know of are located outside Oklahoma, and plaintiff has not disputed that contention. Oklahoma law does not govern whether Terra-Sine stood in an agency relationship with the TAQA defendants, and Oklahoma law does not govern the merits of plaintiff's claims. There is no need to keep this litigation in Oklahoma to avoid piecemeal litigation.

The fourth factor weighs heavily in favor of defendants' position that it would be unreasonable to subject them to suit in Oklahoma.

*(5) States' interest in furthering*
*fundamental substantive social policies*

The fifth factor focuses on whether exercise of personal jurisdiction affects the substantive social policy interests of other states or foreign nations. *Id.* at 1097. Possible conflict with a foreign nation's sovereignty is not dispositive, however, because if given controlling weight, it would always prevent suit against a foreign national in a United States Court. *Id.* Nevertheless, great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field. *Id.*

Facts courts have relied on to determine whether the exercise of jurisdiction interferes with sovereignty include whether one of the parties is a citizen of a foreign nation (TAQA North Ltd. is a Canadian entity); whether the foreign nation's law governs the dispute (an issue this order does not determine); and whether the foreign nation's citizen chose to conduct business with a forum resident (which it did not). Omi Holdings, 149 F.3d at 1098.

-27-

The fifth factor weighs slightly in favor of defendant TAQA North Ltd.'s position that it would be unreasonable to subject it to litigation in Oklahoma. This factor is neutral with respect to TAQA North USA, Inc., a Colorado corporation.

*Sliding Scale*

The sliding scale described in <u>Omi Holdings</u> provides that the weaker a plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction. *Id.* at 1092. Given the court's earlier determination that defendants' contacts with Oklahoma do not even satisfy the minimum contacts test, it is obvious that defendants' burden at the second step is very light.

*Conclusion under the five factor test*

Under the five factor analysis, the court finds and concludes that it would be unfair and unreasonable to require defendants to defend this action in Oklahoma, and that doing so would offend the limitations imposed by the Due Process Clause. As stated in <u>Omi Holdings</u>, "At some point, the facts supporting jurisdiction in a given forum are so lacking that the notions of fundamental fairness inherent in the Due Process Clause preclude a district court from exercising jurisdiction over a defendant." *Id.* at 1098. Fair play and substantial justice would be offended by the exercise of personal jurisdiction over either TAQA defendant. Separate and apart from the court's minimum contacts determination, the defendants are entitled to dismissal on this ground alone.

VII. <u>TAQA North Ltd.'s Argument for Dismissal</u>

<u>Under Rule 12(b)(4).</u>

As the court has found no personal jurisdiction over TAQA North Ltd., it does not reach this defendant's arguments for dismissal under Rule 12(b)(4), which are moot.

-28-

## VIII.  Conclusion

After careful consideration, the court determines that Oklahoma courts do not have personal jurisdiction over either defendant.  The defendants' motions for dismissal are **GRANTED** under Rule 12(b)(2), Fed. R. Civ. P.  Doc. no. 7, 19.  This action is **DISMISSED** without prejudice.

Dated this 25th day of September, 2012.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

12-0761p007.wpd